UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

Aspen Composers' Conference,

      Plaintiff,

    v.                                                    Civil Action No. 12-767 (JRT/SER)

Library of Congress, Cataloging

in Publication Division,

      Defendant

## **BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT**

    Plaintiff Aspen Composers' Conference has brought this action against defendant Library of Congress, alleging that defendant's refusal to issue Cataloging in Publication (CIP) data to plaintiff's publications violates Plaintiff's right of free speech under the First Amendment, and that defendant library, a congressionally organized body, failed in its responsibility to uphold congressional mandates against unfair competition falling within its legislative reach under the Commerce Clause.  Plaintiff makes this motion before the Court to rule in favor of plaintiff and to issue a summary judgement, with the attendant relief requested by the plaintiff.

    This brief in support of plaintiff's Motion for Summary Judgement is divided into Part I – First Amendment claim, and Part II – Commerce Clause claim.

    I.   <u>Part I – Defendant's refusal to issue CIP data violates plaintiff's First Amendment right of free speech</u>

<u>Rule</u>

A public library is a "limited public forum" for purposes of the First Amendment. *Kreimer v. Bureau of Police for Town of Morristown,* 958 F.2d 1242 (C.A.N.J. 1992), *Neinast v. Board of Trustees of Columbus Motropolitan Library,* 346 F.3d 585 (C.A. Ohio 2003), reh'g and suggestion for reh'g denied, cert. denied, 541 U.S. 990 (2004), *Miller v. Northwest Region Library Bd.,* 348 F.Supp.2d 563 (M.D.N.C. 2004), *Armstrong v. District of Columbia Public Library,* 154 F.Supp.2d 67 (D.D.C. 2001), *Sund v. City of Wichita Falls, Tex.,* 121 F.Supp.2d 530 (N.D.Tex. 2000). The government creates a "designated public forum" for First Amendment purposes when it provides Internet access in a public library. *American Library Ass'n, Inc. v. U.S.,* 201 F.Supp.2d 401 (E.D.Pa. 2002), prob. juris. noted 537 U.S. 1017 (2002), rev'd 539 U.S. 194 (2003).

In public libraries, content-neutral time, place or manner regulations that limit permitted First Amendment activities within a limited or designated public forum are constitutional only if 1) they are narrowly tailored, 2) serve a significant government interest, and 3) leave open ample alternative channels of information. *Gay Guardian Newspaper v. Ohoopee Regional Library System,* 235 F.Supp.2d 1362 (S.D.Ga. 2002), aff'd 90 Fed. Appx. 386 (C.A.Ga. 2003).

A county library was a "limited public forum", subjecting its restrictions on the receipt of communication of information through the Internet based on the content of that information to strict scrutiny under First Amendment free speech analysis; a resolution establishing that the library indicated an intent to designate the library as a public forum for the limited purpose of expressive activities it provided, opened the library for use of public at large, and library was compatible with Internet use. *Mainstream Loudoun v. Board of Trustees of Loudoun County Library,* 24 F.Supp.2d 552 (E.D.Va 1998).

First Amendment's free speech guarantee protects not only the right to speak or write, but also the public's rights to purchase information or opinions being made available. *Gasparo v. City of New York,* F.Supp.2d 198 (E.D.N.Y. 1998)

Argument

Plaintiff conference "was organized in 1999 for the purpose of providing a forum for composers to meet with one another and to interact on a professional level." Complaint ¶7. Its activities consist of 1) the organization of an annual conference, and 2) the publication of the

papers ("proceedings") presented at the conference.  The proceedings include, but are not limited to: "musical analyses of the composers' own work; musical analyses of the work of a contemporary, living composer; literary topics related to musical composition; and examinations of the creative process."  Aspen Composers' Conference website, http://www.aspencomposersconference.webs.com (retrieved Sept. 2012).  As such, the conference serves both educational as well as artistic purposes.

Educational institutions occupy a unique place in First Amendment jurisprudence. *Hardy v. Jefferson Community College,* 260 F.3d 671 (C.A. Ky. 2001), reh'g *en banc*  denied, 2001 Fed. App. 0267P (6th Cir. 2001), cert. denied, *Bosser v. Hardy,* 535 U.S. 970 (2002).  All modes by which ideas may be expressed or, perhaps, emotions evoked, including speech, books, movies, art, and music, are within the area of First Amendment concern.  *Universal City Studios, Inc. v. Reimerdes,* 111 F.Supp.2d 294 (S.D.N.Y. 2000), entered 111 F.Supp.2d 346 (S.D.N.Y. 2000), aff'd 273 F.3d 429 (C.A.N.Y. 2001).  Protection of First Amendment is not limited to written or spoken words, but includes other media of expression, including music, pictures, films, photographs, paintings, drawings, engravings, prints, and sculptures.  *ETW Corp. v. Jireh Pub., Inc.,* 332 F.3d 915 (C.A. Ohio 2003), reh'g *en banc* denied 2003 Fed. App. 0207P (C.A. Ohio 2003).  Publishers disseminating work of others who create expressive materials come wholly within the protective shield of the First Amendment.  *ibid.*  Music, mathematical equations, and computer language are "speech" protected by the First Amendment.  *Bernstein v. Dept. of State,* 922 F.Supp.1426 (N.D.Cal. 1996). Academic writing explaining a mathematician's work in cryptography was "speech" of the most protected kind under the First Amendment.  *ibid.*

The Library of Congress maintains a Cataloging in Publication (CIP) program. "The purpose of the CIP is to prepare prepublication cataloging records for those books most likely to be widely acquired by the nation's libraries. The key elements of these records in the form of CIP data are printed in the books and greatly facilitate cataloging activities for libraries. The prepublication cataloging records are also distributed prior to the books' publication in electronic form *via* the Library of Congress MARC (MAchine Readable Cataloging) Distribution Service, alerting libraries, researchers, book dealers, and bibliographic services around the world to forthcoming titles." *CIP Publisher's Manual*, Library of Congress, Washington D.C. (2001) at 1.

Since 2005, the plaintiff's proceedings have been organized by a prevalent topic of that year's Conference. This serves three main purposes, which are:

a) To identify and expand the topics considered, which are not identifiable under the general heading of "music";

b) To aid in the articulated on-going musical exchange among artists, so that they may identify other contemporaneous artists who are making contributions in a specific topic; and

c) To assist researchers in musical scholarship who do subject-matter searches on the topics which are being researched.

Complaint ¶9. Plaintiff received CIP data for four publications of its annual proceedings. Complaint ¶12. The CIP data to all but one of these publications was ultimately rescinded without the publisher's knowledge. Complaint ¶12. Defendant has also denied CIP data to plaintiff's current application for *Music and Culture*. Complaint ¶15.

Under *Kreimer,* a public library is a "limited public forum" for First Amendment purposes. By the *Gay* test, in public libraries, content-neutral time, place, or manner regulations that limit permitted First Amendment activities within a limited or designated forum are constitutional only if they are 1) narrowly tailored, 2) serve a significant government interest, and 3) leave open ample alternative channels of information. Specifically, the "limited public forum" of individual organizations to which CIP data is made available includes "libraries, researchers, book dealers, and bibliographic services around the world." *CIP Publisher's Manual.* By denying plaintiff CIP data, the defendant has limited permitted First Amendment activities of its composer participants under *Universal City Studios, ETW Corp.,* and *Bernstein.* Under *Gay*, defendant must demonstrate that its regulations are 1) narrowly tailored, 2) serve a significant government interest, and 3) leave open ample alternative channels of information. Defendant has not demonstrated that the CIP regulations are narrowly tailored, serve a significant governmental interest, or that it has left open alternative channels by which the information contained in the CIP data may be readily accessed by libraries, researchers, book dealers, and bibliographic services around the world. *Music and Politics*, the only publication of the plaintiff to currently hold CIP data, has sold approximately thirty copies to libraries around the world. Complaint ¶13. The remaining publications from which CIP data was rescinded (and which were subsequently re-classified by defendant as "serial" publications) have not sold a single copy. Complaint ¶14. Under *Gasparo,* the First Amendment not only protects the right to speak or write, but also the public's right to purchase information being made available.

*U.S. West, Inc. v. FCC* involved FCC regulations that required telecommunications companies to obtain affirmative approval from a customer before the company could use that customer's "customer proprietary network information" (CPNI) for marketing purposes. *U.S.*

*West, Inc. v. FCC,* 182 F.3d 1224 (C.A. 10th Cir. 1999), cert. denied *Competition Policy Institute v. U.S. West, Inc.*, 530 U.S. 1213 (2000), on remand *In re Implementation of Telecommunications Act of 1996*, 2001 WL 1027987 (F.C.C.).  Although that case involved a regulation which was purportedly enacted to protect customers' privacy, the decision is relevant to the case at hand because of 1) its consideration of the level of scrutiny afforded to government agencies when a regulation has been challenged on constitutional grounds, and 2) the various considerations raised with regard to the electronic dissemination of information.  "This case is a harbinger of difficulties encountered in this age of exploding information," said the court in *U.S. West*, "when rights bestowed by the United States constitution must be guarded as vigilantly as in the days of handbills on public sidewalks…Policing the boundaries among constitutional guarantees, legislative mandates, and administrative interpretation is at the heart of our responsibility."  *U.S. West* at 1228.

The court in *U.S. West* stated that "deference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions…Therefore, if we determine the FCC's customer approval rule presents a serious or grave constitutional question, we will owe the FCC no deference, even if its CPNI regulations are otherwise reasonable, and will apply the rule of constitutional doubt." *ibid.* at 1231.  "Although the text of the First Amendment refers to legislative enactments of Congress, it is actually much broader in scope and encompasses, among other things, regulations promulgated by administrative agencies." *ibid.* at 1232.

*U.S. West* also examines the necessary components of any review of free speech.  "Effective speech has two components: a speaker and an audience.  A restriction on either of these components is a restriction on speech." *ibid.* at 1232 (citing *Virginia State Bd. of*

*Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748 (1976) for "the First Amendment protects the communication, whether the speech restriction applies to its source or impinges upon the audience's reciprocal right to receive the communication", and *Martin v. City of Struthers,* 319 U.S. 141 (1943)*,* for "a restriction on speech tailored to a particular audience, 'targeted speech', cannot be cured simply by the fact that a speaker can speak to a larger indiscriminate audience, 'broadcast speech'"). In the present case, the denial of CIP data to the plaintiff restricts plaintiff's right to have specific information about their publications to be received by "libraries, researchers, book dealers, and bibliographic services around the world". *supra.*

Although the court in *U.S. West* employed a different test ("substantial state interest" for "commercial speech", rather than "significant governmental interest" for a "limited public forum" as set out in *Kreimer*), it stated that, "When faced with a constitutional challenge, the government bears the responsibility of building a record adequate to clearly articulate and justify state interest." *ibid.* at 1234. In the present case, defendant has not indicated any record whatsoever to either articulate or justify its interest in denying CIP data to the plaintiff. Under both tests, however, regulations must be "narrowly tailored" to serve the government's interest. "Narrow tailoring means that the government's speech restrictions must signify a 'careful calculation of the costs and benefits associated with the burden on speech imposed by its prohibition'." *ibid.* at 1238 (citing *Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410 (1993)). In the case at hand, defendant has not shown any "careful calculation of the costs and benefits" resulting from denying plaintiff CIP data.

*Bullfrog Films, Inc. v. Wick,* 847 F.2d 502 (C.A. Cal.1988), involved a challenge to the United States Information Agency (USIA) charged with the domestic administration of the

Beirut Agreement, "a multilateral treaty aimed at facilitating the international circulation of educational, scientific and cultural audio-visual material". Plaintiffs alleged that the USIA's denial of certification of its films violated their right to free speech under the First Amendment. The test employed by *Bullfrog* was that 1) the regulations were necessary to serve a compelling state interest, and 2) that they were narrowly drawn to achieve that end. As plaintiff has demonstrated above, defendant has not satisfied their burden with either prong of this test. However, it is *Bullfrog's* dicta regarding the third prong of the *Gay* test (that the challenged regulation must leave open ample alternative channels of information) that is most relevant to the case at hand. *Bullfrog* states, "Counsel for the USIA suggested that benefits approximating those attainable under the Agreement might be available through other channels. We find this contention meritless because 1) there is no evidence that there exists more than a theoretical possibility that comparable benefits might somehow be obtained, and 2) without a USIA certificate, plaintiffs may not receive benefits *under* the Agreement. Even if similar benefits could be had through what can only be presumed to be the *largesse* of a foreign government, the need to hurdle special obstacles is itself a detriment which confers standing." *Bullfrog* at 507, note 6. And, "If plaintiff's films are certified by the USIA, they at least stand a chance of winning foreign acceptance…Opening the door to the possibility of obtaining sought after benefits is sufficient to satisfy the redress requirement." *ibid.* at 507-8.

   Because defendant library has not met the test for content-neutral time, place or manner regulations within a limited or designated public forum, they have not withstood a challenge to their withholding of CIP data and its subsequent transmission to potential audience members as a violation to plaintiff's right to free speech on First Amendment grounds.

II. <u>Part II – Defendant library, a congressionally organized body, is responsible to congressional mandates against unfair competition falling within its legislative reach under the Commerce Clause. Defendant library has committed unfair trade practices in disregard of these mandates, and has further neglected its role as an indexer and disseminator of information.</u>

Rule

The Commerce Clause of the Constitution states that the United States Congress shall have the power

**To regulate Commerce with foreign Nations, and among the several States.**

U.S. Const. art.1, §8, cl.3. The power conferred on Congress by the commerce clause of the Constitution is one of the great powers of the national government; and it is not exceeded in importance to the welfare of the nation by another power granted to Congress. It is broad and sweeping, general, and continuing, but also distinct and substantive, full, complete in itself, supreme and paramount. 15 C. J. S. Commerce Clause §6 (1967).

ARGUMENT

In its authority granted by the Commerce Clause, Congress periodically seeks to remedy perceived injustices in trade and commerce. The threshold requirement for an action to be brought within federal jurisdiction is that the complained of behavior is involved with or affect interstate commerce.

The Lanham Act was enacted in 1946 to counter unfair trade practices caused by fraudulent use of trademarks. 15 U.S.C. §1051 *et seq.* (2009). In publishing cases, the interstate activity requirement was satisfied by the out-of-state residence of students, and the professor had a publishing contract with an out-of-state publisher. *University of Florida v. KPB,* 89 F.3d 773 (C.A.Fla. 1996). Although the law concerning the internet is in a rapidly evolving and fluid

state, at least one federal court has found that, "The Internet is generally an instrumentality of interstate commerce". However, it found it necessary to circumscribe this definition by adding, "This does not mean that any use of the Internet is necessarily commercial for purposes of the Lanham Act". *Utah Lighthouse Ministry v. Foundation for Apologetic Information and Research,* 527 F.3d 1045 (C.A. Utah 2008).

Plaintiff conference is a non-profit corporation organized under the laws of Minnesota. Complaint "Jurisdiction" ¶6. Its activities consist of 1) organizing an annual conference in the state of Colorado; 2) advertising said conference on the internet; 3) hosting presenters from the entire United States, as well as foreign countries; 4) publishing proceedings from said conference in Minnesota; and 5) selling said proceedings to individuals and libraries throughout the United States and in foreign countries. All of these activities, with the exception publication, satisfy the interstate activity requirement necessary to fall within congressional reach on proscriptions on unfair trade.

Congress is also concerned with the incidental effects of fraudulent use of trademarks, such as decrease in sales. A federal court found that a defendant's behavior "resulted in decrease of sales of genuine gaming machines…and decrease owner's revenue from sales, had some effect on American foreign commerce as required to apply Lanham Act extraterritorially." *Aristocrat Technologies, Inc. v. High Impact Design and Entertainment,* 642 F.Supp.2d 1228 (D.Nev. 2009).

Defendant library has refused and/or rescinded CIP data to several of plaintiff's publications. Complaint ¶12. The sole publication of plaintiff to retain CIP data has sold approximately thirty copies worldwide. Complaint ¶13. The publications which were stripped of their CIP data have

not sold a single copy.  Complaint ¶14.  Thus, plaintiff in the instant case has suffered economic loss to satisfy congressional legislation with regard to unfair trade practices.

The Robinson-Patman Price Discrimination Act was enacted in 1936 to combat anticompetitive practices by producers, specifically price discrimination.  15 U.S.C. §13 (2009).  A federal court found that sales of a newspaper printed in Missouri to branch dealers in Illinois were sales "in commerce" and thus satisfied interstate commerce requirement for jurisdiction under the Act.  *Godfrey v. Pulitzer Publishing Co.,* 161 F.3d 1137 (C.A.Mo. 1998), cert. denied 526 U.S. 1098 (1999), appeal after remand 276 F.3d 405 (C.A.Mo. 2002), reh'g denied.  Plaintiff conference proceedings sold thirty copies worldwide, *supra,* thus satisfying the interstate commerce requirement under *Godfrey*.   The particularly thorny issue of internet publication was examined in Plaintiff's Reply to Defendant's Memorandum of Points and Authorities with regard to venue.  With regard to interstate commerce, a federal court has found that, "The Internet fits within parameters of interests traditionally protected by the commerce clause." *American Libraries Ass'n v. Pataki,* 969 F.Supp. 160 (S.D.N.Y. 1997).  And although defendant library's MARC Distribution Service is worldwide in scope (*CIP Publisher's Manual,* Library of Congress, Washington D.C. (2001) at 1), a federal court has found that advertising *within a state* can impinge on interstate commerce and violate the commerce clause.  *Hyatt Corp. v. Hyatt Legal Services,* 610 F.Supp. 381 (N.D. Ill. 1985).

Even outside the parameters of congressional legislation by authority of the commerce clause, the Supreme Court has stated that the federal government *has a particular interest in eliminating restraints on fair competition*, even when individuals or entities subject to particular regulation are engaged in expressive activity protected by the First Amendment.  *Turner Broadcasting System, Inc. v. FCC,* 520 U.S. 189 (1997).

Defendant library is a "national library".  The Library of Congress is now the only national library that aims to have a comprehensive worldwide collection.  Line, M.B., *What Do National Libraries Do in the Age of the Internet?*  13 Ariadne 6, 6-9 (1998), http://www.ariadne.ac.uk/print/issue13/main (retrieved Oct. 2012).  International access is improving yearly as the catalogues of more and more significant libraries become accessible on-line and libraries come to take more seriously their obligation to supply books in their ownership to other libraries.  *ibid.* at 7.  The ultimate opportunity [for national libraries] is transformation…into information storers and providers, reaching a large number and wider range of users in a wider variety of ways and playing an interactive part as information exchanges.  *ibid.*  Noone dares to predict precisely what will happen to currently published journals and books.  However, it seems likely that most books will stay as they are, and scholarly journals will fall into three categories: print only, print plus on-line, and on-line only, possibly in roughly equal proportions.  If this is so, national libraries will still be immensely useful…to have a vast collection of serials, conference proceedings, reports and books dedicated to supply other libraries.  *ibid.* at 8.

Defendant library's CIP data dissemination over its website MARC Distribution Service falls precisely into the definition of the role national libraries will play in the future as "information storers and providers, reaching a large number and wider range of users in a wider variety of ways and playing an interactive part as information exchanges." *supra.*  It is in defendant's library's interest to improve their techniques at identifying and classifying materials, rather than attempting to brush them aside under general headings, such as "serials".  Mr. Line, the former director of the British Library who authored the above article distinguishes "serials" from "conference proceedings" in his list of types of materials which national libraries will be

responsible for cataloging.  Defendant library has attempted to classify plaintiff's proceedings as "serials" in order to deny them CIP data.  Complaint ¶11.

The defendant library's CIP prepublication program distributes information about its catalogued books *via* the MARC Distribution Service, "alerting libraries, researchers, book dealers, and bibliographic services around the world" to both bibliographic as well as subject-heading contents of new publications.  See attached Exhibit A.  Librarians and researchers have long recognized that controlled organization access points such as cataloging, indexes, and subject headings provide research efficiencies otherwise lacking in the full text environment.  Novak, J.R. and Pardo, L.A., *The Evolving Nature of Faculty Publications,* 26:1-2 Legal Reference Service Quarterly 216, 209-232 (2007).

The stated purpose of publishing plaintiff conference proceedings are:

a) To identify and expand the topics considered which are not identifyable under the general heading of "music";

b) To aid in the articulated on-going musical exchange among artists, so that they may identify other contemporaneous artists who are making contributions in a specific topic; and

c) To assist researcher in musical scholarship who do subject-matter searches on the topics which are being researched.

Complaint ¶9.  The committee recommendation of the American Association of Law Libraries stated that "the greatest contribution…librarians…can make is in the establishment of a standardized list of subjects to be used for the subject metadata tags.  These will greatly enhance the retrieval of articles".  Novak at 216.  This definition falls into the express purposes of plaintiff's publications, and which would be greatly benefitted by both the issuance of CIP data,

as well as its electronic dissemination, but which defendant library has refused to do for all but one publication.  Complaint ¶13.

Congress has also spoken on the issue of damages.  The Computer Fraud and Abuse Act was enacted in 1986 to reduce cracking of computer systems and to address federal computer-related offences.  18 U.S.C.A. §1030(e)(11) (2009).  A federal court has found that, "A party's…lost revenue or consequential damages, such as losses associated with missed business opportunity, are only recoverable if they were incurred because of interruption of service." *Animators at Law, Inc. Capital Legal Solutions, LLC,* 786 F.Supp.2d 1114 (E.D.Va. 2011).  Plaintiff sold approximately thirty copies of its proceedings worldwide for the publication which was granted CIP data. *supra.* When defendant library rescinded its CIP data for subsequent publications, this constituted an "interruption of service" under *Animators at Law*.  No publication of plaintiff's has sold which does not have CIP data.  Thus, defendant's rescision of CIP data warrants recovery as "losses associated with missed business opportunity".

CONCLUSION

Defendant library has not met the test for content-neutral time, place or manner regulations within a limited or designated public forum, and thus they have not withstood a challenge to their withholding of CIP data and its subsequent transmission to potential audience members as a violation to plaintiff's right to free speech on First Amendment grounds.

In addition, Congress has plenary powers vested by the Commerce Clause of the Constitution to regulate trade within the fifty states and abroad.  It has expressed its concern for unfair trade practices in legislation such as the Lanham, Robinson-Patman, and Computer Fraud and Abuse

Acts.  The Supreme Court has ruled that, "The federal government *has a particular interest in eliminating restraints on fair competition*".

Congress has organized a national library, the Library of Congress.  The responsibilities of a national library are continually evolving, and include the responsibility of becoming the future "information storers and providers, reaching a large number and wider range of users in a wider variety of ways and playing an interactive part as information exchanges."

Defendant library, a congressionally organized body, is responsible to congressional mandates against unfair competition falling within its legislative reach under the Commerce Clause.  Defendant library has committed unfair trade practices in disregard of these mandates, has neglected its role as an indexer and disseminator of information, and has caused commercial harm to the plaintiff in the amount of $2,583.04.  Complaint, "Request for Relief".  In addition, defendant library has not "embraced the spirit of open access [or] the respect for the diversity of forms of scholarly output".  Novak at 224.  The proceedings of plaintiff conference include original compositions, graphs, numerical tables, creative essays, musical analyses, and biographies, as well as traditional academic articles.  In addition, it has abrogated its duty as a library at a time when, "It is critically important for librarians to assume leadership roles and maintain responsibility for institutional repositories if they are to remain relevant during this next phase of the technological revolution".  Novak at 225.

For the above reasons, plaintiff prays that the Court issue a Summary Judgement for the plaintiff, re-instate the CIP data stripped from publications which had been granted CIP data in the past, grant CIP data to plaintiff's Application submitted on 9 February 2012 for *Music and Culture*, and award damages to the plaintiff in the amount of $2,583.04 plus costs.

Respectfully Submitted


Natalie Synhaivsky
Aspen Composers' Conference
5505 Brookview Avenue
Edina, Minnesota  55424
(952)926-1085