UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 12-767 (JRT/SER)

| | |
|---|---|
| Aspen Composers' Conference, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **MEMORANDUM IN SUPPORT** |
| | ) **OF MOTION TO DISMISS** |
| Library of Congress, Cataloging in | ) |
| Publication Division, | ) |
| | ) |
| Defendant. | ) |

## I. INTRODUCTION

Defendant, the Library of Congress ("Library"), by and through its undersigned counsel, respectfully moves this Court to dismiss the above-captioned complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) because the United States has not waived sovereign immunity to constitutional suits for money damages and because Plaintiff's requested for relief involving unknown future publications is not ripe for review. The Library also requests that the Complaint be dismissed under Rule 12(b)(6) because Plaintiff has failed to state a claim upon which relief can be granted under the First Amendment or the Commerce Clause. Because Plaintiff is unable to cure these deficiencies, the Complaint should be dismissed in its entirety with prejudice.

## II. BACKGROUND

The Library of Congress is an agency in the legislative branch of the United States Government. *See* 2 U.S.C. §§ 131-85 (2006) (laws governing the Library are found in

Title 2, "The Congress"). "The Library's mission is to support the Congress in fulfilling its constitutional duties and to further the progress of knowledge and creativity for the benefit of the American people." *Library of Congress Mission Statement*, http://www.loc.gov/about/mission.html (accessed on Feb. 14, 2013). To further its mission, the Library has created the Cataloging in Publication Program ("CIP Program") to "record the bibliographic data elements of a work and facilitate access to it in library catalogs." *Cataloging in Publication Program Frequently Asked Questions*, http://www.loc.gov/publish/cip/faqs/ (accessed on Feb. 14, 2013). The CIP Program was created under the broad statutory authority given to the Librarian of Congress to make rules and regulations for the operation of the Library. *See* 2 U.S.C. § 136.

The CIP Program allows publishers to submit copies of manuscripts to the Library prior to publication for the Library's advance preparation of a bibliographic record, also known as "CIP data," that publishers include on the copyright page of the published work and that the Library includes in "a machine-readable version of the record . . . distributed to large libraries, bibliographic utilities, and book vendors around the world." *About CIP: Application Process*, http://www.loc.gov/publish/cip/about/process.html (accessed on Feb. 14, 2013). There is no fee for CIP processing, however participants are obligated to send a complimentary copy of all works for which CIP data was provided to the Library after publication. *Cataloging in Publication Program Frequently Asked Questions*, *supra*. The CIP Program is not open to all publishers, however, because of the limited resources the Library has to support the Program. *Id*. Only publishers who publish works that are most likely to be acquired by U.S. libraries are eligible to participate. *Id.* Additionally,

2

the CIP Program excludes, *inter alia*, books paid for or subsidized by individual authors, books published by firms that have published books by fewer than three different authors, e-books, and, relevant here, serials.[1] *About CIP: Ineligible for CIP*, http://www.loc.gov/publish/cip/about/ineligible.html (accessed on Feb. 14, 2013). All policies associated with the CIP Program are developed in consultation with the library community through meetings held with librarians at the semi-annual conference of the American Library Association. *Cataloging in Publication Program Frequently Asked Questions*, *supra*.

When a work does not qualify for CIP data because it is a serial, it may, alternatively, be eligible to receive an International Standard Serial Number ("ISSN") from the U.S. ISSN Center of the Library of Congress, so long as the work is issued by a U.S. publisher. *Id.* An ISSN is a standard eight-digit number that uniquely identifies a serial publication regardless of place of publication, language, frequency, or medium. *Id.* "The ISSN also helps library patrons, libraries, and others who handle large numbers of serials to find and identify titles in automated systems more quickly and easily." *U.S. ISSN Center: Frequently Asked Questions*, http://www.loc.gov/issn/faq/index.html (accessed on Feb. 14, 2013).

---

[1] Included in the term "serial" are "[p]eriodicals, magazines, journals, annuals, and other publications issued regularly under the same title," publications where only the date or the volume number change from one issue to the next, publications that are intended to continue indefinitely, reprints of previously published serial issues, and single articles reprinted from periodicals and other serials. *About CIP: Ineligible for CIP*, http://www.loc.gov/publish/cip/about/ineligible.html (accessed on Feb. 14, 2013).

Plaintiff Aspen Composers' Conference ("Aspen") is an organization located in Edina, Minnesota that hosts an annual conference for composers and publishes papers presented at its conferences. (Compl. ¶¶ 1, 7-8.) Since 2002, Plaintiff has published the proceedings of six conferences: (1) *The Proceedings of the 2001 Aspen Composers' Conference*; (2) *The Proceedings of the 2002 Aspen Composers' Conference*; (3) *The Proceedings of the 2003 Aspen Composers' Conference*; (4) *Music and Politics*; (5) *Music and Time*; and (6) *Music and Words*. (Compl. ¶ 8.) As of the date Plaintiff filed its Complaint, it was also preparing to publish a work entitled *Music and Culture*. (Compl. ¶ 15.)

Other than *The Proceedings of the 2001 Aspen Composers' Conference*, Plaintiff attempted to enter each of the works noted above into the CIP Program prior to their publication. (Compl. ¶¶ 10, 15.) After reviewing Plaintiff's applications, the Library identified *The Proceedings of the 2002 Aspen Composers' Conference* and *The Proceedings of the 2003 Aspen Composers' Conference* as serial publications and determined that these works were not eligible for the CIP program. (Compl. ¶¶ 11-12.) The Library originally included *Music and Time* and *Music and Words* in the CIP Program, but their inclusion was subsequently rescinded because these works were later determined to be serials as well. (Compl. ¶ 12.) The CIP application for *Music and Culture* was also denied because it was determined to be a serial. (*See* Compl. ¶ 15.)

### III.   PROCEDURAL BACKGROUND

Plaintiff filed this Complaint on March 27, 2012, seeking both equitable and monetary relief pursuant to allegations that the Library's denial of CIP data was

4

unconstitutional under the First Amendment and the Commerce Clause. As an initial matter, because the United States has not waived sovereign immunity to constitutional suits for monetary damages, this Court lacks jurisdiction to grant such relief. Regardless, Plaintiff has failed to plead a cognizable claim under the First Amendment and the Commerce Clause, warranting dismissal under Rule 12(b)(6). Finally, insofar as Plaintiff seeks equitable relief as to future unknown publications, such relief is premature and unripe for judicial review.

## IV. ARGUMENT

### A. This Court Lacks Subject Matter Jurisdiction to Consider Plaintiff's Request for Monetary Relief.

1. Standard of Review

Under the Federal Rules of Civil Procedure, a complaint may be dismissed for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A party may make either a facial or factual challenge to a court's subject matter jurisdiction. *Osborn v. United States*, 918 F.2d 724, 729 n.6. (8th Cir. 1990). When considering a facial attack, as is here, on jurisdiction, the court restricts itself to the face of the pleadings. *Id.* The plaintiff has the burden of proof that jurisdiction does in fact exist. *Id.* at 730. Lack of subject matter jurisdiction, unlike many other objections to the jurisdiction of a particular court, cannot be waived; "[i]t may be raised at any time by a party to an action, or by the court *sua sponte*." Bueford v. Resolution Trust Corp., 991 F.2d 481, 485 (8th Cir. 1993) (citing Fed. R. Civ. P. 12(h)(3)).

2. The United States Has Not Waived Sovereign Immunity from Constitutional Suits for Money Damages.

The United States, including its agency and employees, can be sued only to the extent that sovereign immunity has expressly been waived. *United States v. Mitchell*, 463 U.S. 206, 212 (1983); *Preferred Risk Mut. Ins. Co. v. United States*, 86 F.3d 789, 792 (8th Cir. 1996). "Indeed, the 'terms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). Thus, absent a waiver of sovereign immunity, a federal court does not have subject matter jurisdiction over cases against the United State government. *FDIC*, 510 U.S. at 475. The United States has not waived its sovereign immunity from suits seeking monetary damages for alleged violations of the Constitution. *Id.* at 477. Accordingly, insofar as Plaintiff's First Amendment and the Commerce Clause claims seek monetary damages, this Court must dismiss for lack of subject matter jurisdiction.

**B. Plaintiff Fails to State a Cognizable Claim under the First Amendment and the Commerce Clause.**

1. Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). A court must review the plausibility of the Plaintiff's claim as a whole, rather than assess the plausibility of each individual allegation. *Zoltek Corp. v. Structural Polymer Group*, 592 F.3d 893, 896 (8th Cir. 2010). This "context-specific task . . . requires the reviewing court to draw on its judicial experience and common

6

sense," and allows a court to consider more likely explanations in determining whether a plaintiff is entitled to relief. *Ashcroft*, 556 at 679. "While courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; without converting the motion into one for summary judgment." *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n. 3 (8th Cir. 2012) (quotations omitted).

The Supreme Court has described a "two-prong approach" courts should use when analyzing pleadings for sufficiency and evaluating motions to dismiss under Rule 12(b)(6). *Ashcroft*, 556 U.S. at 678. First, a court must "identify[] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Second, if a court is able to identify non-conclusory, well-pleaded factual allegations, it "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown' that the pleader is entitled to relief." *Id.* at 678 (citing Fed. R. Civ. Pro. 8(a)(2)). A complaint must also show that the allegedly illicit conduct alleged is not "more likely explained" by lawful behavior. *See id.* at 680-81.

2. <u>Plaintiff's Complaint is Based on Mere Conclusory Statements.</u>

A complaint is not required to contain detailed factual allegations, however "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *C.N. v. Willmar Pub. Sch.*, 591 F.3d 624, 629-30 (8th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations and alteration omitted)). In its Complaint, Plaintiff merely provides this Court with legal conclusions that are not entitled to the assumption of truth. Namely, Plaintiff has stated that its rights under the Commerce Clause and First Amendment were violated, but has not shown how the Library's denial of CIP Data violated these rights. Indeed, Plaintiff fails to state any elements that comprise its claims or provide an explanation of how the Library's conduct met these elements, therefore making Plaintiff entitled to no relief. Rather, Plaintiff merely alleges that the Library has "censored the free exchange of information among artists," "barred [its] publications from electronic data bases used by libraries," and hindered the Plaintiff's ability to generate income from its publications. (Compl. ¶ 15.) These declarations are mere conclusory statements that are not entitled to the assumption of truth, and do not result in sufficiently pled claims. Therefore, Plaintiff's Complaint should be dismissed.

3. <u>Plaintiff Has Not Alleged a Violation of the First Amendment's Free Speech Protections Because the CIP Program is a Non-Forum.</u>

In its Complaint, Plaintiff asserts that the Library has prevented it from disseminating information about its publications by denying it CIP data, and therefore has

violated the Plaintiff's First Amendment right of free speech. (Compl. ¶¶ 4, 15.) Although, as stated above, Plaintiff has provided no more than conclusory statements regarding this claim, Plaintiff nonetheless fails to state a First Amendment claim under the "public forum" doctrine.

The United States Supreme Court has recognized three types of speech fora that it uses to adjudicate First Amendment cases: (1) the traditional public forum; (2) the public forum created by government designation; and (3) the nonpublic forum. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998); *Cornelius v. NAACP Legal Def. & Ed. Fund, Inc.,* 473 U.S. 788, 802 (1985). Additionally, the Court has acknowledged the possibility that government property subject to a First Amendment attack may not even be considered a forum for speech at all. *Ark. Educ. Television Comm'n*, 523 U.S. at 677. The CIP program at issue in this lawsuit is one such non-forum.[2]

---

[2] At the outset, it is worth noting that the appropriate subject of First Amendment forum analysis in this case is the CIP Program itself, as opposed to the real property on which the Library or Congress is situated, or the libraries to which CIP data is made available. *See Cornelius*, 473 U.S. at 801 (holding that the Combined Federal Campaign, not the federal workplace, was the appropriate forum to analyze); *Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983) (internal mail system and teachers' mailboxes, not the schools themselves, were the appropriate fora to analyze because Plaintiff sought access to this particular means of communication, not the school grounds generally). "[I]n defining the forum [the Court] [has] focused on the access sought by the speaker." *Cornelius*, 473 U.S. at 801. As such, this Court should limit its analysis to the particular means of communication Plaintiff seeks access too, namely inclusion in the CIP Program. In fact, in the only case to review a First Amendment attack on this issue, the Court of Federal Claims limited its focus to determining whether the CIP program was a forum for speech, and nothing else. *Overview Books, LLC v. United States*, 72 Fed. Cl. 37, 45-46 (Ct. Fed. Claims), *aff'd per curiam*, 232 Fed. App'x 989 (Fed. Cir. 2007), *cert denied* 552 U.S. 1259 (2008).

"Traditional public fora are defined by the objective characteristic of the property, such as whether, 'by long standing tradition or by government fiat,' the property has been 'devoted to assembly and debate.'" *Id.* at 677 (quoting *Perry Educ. Assn.*, 460 U.S. at 45). Examples of traditional public fora include "streets, sidewalks, and parks, which by custom have long been open for public assembly and discourse." *Denver Area Educ. Telecomm. Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 791 (1996). The Supreme Court has "rejected the view that traditional public forum status extends beyond its historic confines." *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 206 (2003) (citation omitted). "The doctrines surrounding traditional public forums may not be extended to situations where such history is lacking." *Id.* (holding that internet access in public libraries is neither a traditional nor a designated public forum).

A designated public forum is a nontraditional public forum that the government intentionally opens to public discourse. *Ark. Educ. Television Comm'n*, 523 U.S. at 677. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a non-traditional forum for public discourse." *Am. Library Ass'n, Inc.*, 539 U.S. at 206 (citing *Cornelius*, 473 U.S. at 802). The government's exclusion of a speaker from either a traditional public or a designated public forum will be subject to strict scrutiny. *Ark. Educ. Television Comm'n*, 523 U.S. at 677.

"Other government properties are either nonpublic fora or not fora at all." *Id.* (citing *Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678-79 (1992)). The government may restrict access to a nonpublic forum so long as the limitations are

10

reasonable in light of the forum's purpose and all surrounding circumstances and not intended to suppress a particular viewpoint. *Cornelius*, 473 U.S. at 800, 809. Additionally, the Court has noted that "[t]he First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." *Id.* at 809. Finally, as is the case here, it may be possible that government property is not considered a forum for speech at all and that a plaintiff does not therefore have a claim under the First Amendment. *Ark. Educ. Television Comm'n*, 523 U.S. at 677.

The Supreme Court has already held that First Amendment forum analysis does not apply to "a public library's exercise of judgment in selecting the material it provides to its patrons." *United States v. Am. Library Ass'n, Inc.*, 539 at 205. "Just as forum analysis and heightened judicial scrutiny are incompatible with the role of public television stations and the role of the [National Endowment for the Arts], they are also incompatible with the discretion that public libraries must have to fulfill their traditional missions." *Id.* "Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them." *Id.* There, the Court held that a "public library does not acquire internet terminals in order to create a public forum for web publishers to express themselves." *Id.* at 206. In finding that forum analysis was incompatible for challenging a library's decision to provide internet access, the court reasoned that "[t]he Internet is simply another method for making information available in a school or library." *Id.* at 207 (citation omitted). "It is no more than a technological extension of the book stack." *Id.* (citation omitted).

11

Only one court has had occasion to evaluate the CIP Program specifically within the context of a First Amendment challenge. *See Overview Books, LLC*, 72 Fed. Cl. at 46 (finding plaintiff's implied factual premise that the Library's CIP Program created a forum for speech from which Plaintiff could not be excluded was incorrect). There, the court held that "[t]he CIP [P]rogram was not created for the purpose of creating a forum for speech, but rather for the efficient cataloging of books most likely to be acquired by libraries." *Id.* By determining that the CIP program was a "non-forum," the court found that the plaintiff's had failed to state a claim that its free speech rights had been violated and therefore dismissed the complaint under Rule 12(b)(6).

Accordingly, because the Library of Congress never intended to establish a forum for speech when it created the CIP Program, Plaintiff may not challenge its denied access to the program under the First Amendment. Moreover, because Plaintiff cannot correct this deficiency pleading, the Court should dismiss this claim with prejudice.

    4. <u>Even if Viewed as a Forum for Speech, Plaintiff Still Fails to Allege a Claim Under the First Amendment.</u>

Even if this Court were to believe that the CIP Program constitutes a forum for speech, it could only be considered a nonpublic forum, because a cataloging program is not traditionally "devoted to assembly or debate" or intentionally opened to public discourse. *See Ark. Educ. Television Comm'n*, 523 U.S. at 677; *Perry Educ. Ass'n*, 460 U.S. at 45. The authorization for the CIP Program comes from the statutory authority given to the Librarian of Congress to "make rules and regulations for the government of the Library." 2 U.S.C. § 136. As a result, the Library has broad discretion to determine

12

the requirements of the CIP Program. Plaintiff's disagreement with the CIP Program's stated parameters does not create a right to challenge the CIP Program's scope.

Under the nonpublic forum framework, the CIP Program's eligibility requirements are reasonable since the restrictions are viewpoint neutral and exist only in light of the Library's goal of providing information to U.S. libraries about works most likely to be acquired and in consideration of the limited resources available to the Library. Therefore, the Library's exclusion of serials from the CIP Program, and specifically the exclusion of several of Plaintiff's publications, are permissible restrictions that exist to keep the CIP Program manageable in light of limited funding. *See Cornelius*, 473 U.S. at 809 (finding a federal program would be "administratively unmanageable if access could not be curtailed in a reasonable manner"). In addition, should the CIP Program be considered a nonpublic forum, the First Amendment does not demand that the Library grant unfettered access to it simply because it offers one method for Plaintiff to make information about its publications available.[3] Because Plaintiff has not stated a claim under the forum framework that entitles it to relief for violations of the First Amendment, Plaintiff's Complaint should be dismissed.

     5. <u>Plaintiff also Fails to Allege a First Amendment Claim Under the Unconstitutional Conditions Doctrine.</u>

Plaintiff has also failed to state a cognizable claim under the "unconstitutional conditions" doctrine of the First Amendment. "Unconstitutional conditions" cases

---

[3] As discussed above, another avenue for disseminating information that Plaintiff could avail itself of is the ISSN Program, which "helps library patrons, libraries and others who handle large numbers of serials to find and identify titles in automated systems more quickly and easily." *U.S. ISSN Center: Frequently Asked Questions*, *supra.*

involve scenarios where the government has placed a condition on a recipient of a subsidy (rather than on a particular program or service), and limits that recipient's ability to engage in a particular protected activity outside the scope of the federal program. *Rust v. Sullivan*, 500 U.S. 173, 197 (1991). The federal government "has wide latitude to set spending priorities," *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998), so long as it does not "discriminate invidiously in its subsidies in such a way as to '[aim] at the suppression of dangerous ideas,'" *Regan v. Taxation with Representation*, 461 U.S. 540, 548 (1983) (quoting *Cammarano v. United States*, 358 U.S. 498, 513 (1959)); *see also Fed. Commc'n Comm'n v. League of Women Voters*, 468 U.S. 364, 400-401 (1984) (invalidating a law providing that noncommercial television and radio stations receiving federal grants may not engage in any editorializing, even where the stations do not use federal money to do so); *Regan*, 461 U.S. at 545 (holding that Congress may refuse to subsidize lobbying activities of charitable organizations by prohibiting the use of tax-deductible contributions to support those efforts, although the organizations may still use deductible contributions to support non-lobbying activities). Therefore, where the government has chosen to use funds to establish a program, it may use its authority to define the program's parameters. *Rust*, 500 U.S. at 194, 198 (1991). It may also "selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Id.* at 193. Such a decision is not discrimination based on viewpoint, but merely a choice to fund one activity without funding another. *Id.* (citing *Maher v. Roe*, 432 U.S. 464, 475 (1977) ("There is a basic difference between

direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy.")). "To hold that the Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals, would render numerous Government programs constitutionally suspect," an untenable proposition in light of Supreme Court precedent. *See id.* at 194 (citing *Regan*, 461 U.S. at 548).

The CIP Program is an example of the government choosing to fund one program (the cataloging of manuscripts), but not another (the cataloging of serials), a decision that is well within the Library's discretion. Through the CIP Program, the Library uses its limited resources to advance the Library's goal of cataloging, prior to publication, those materials most likely to be acquired by libraries. As a result, it has been necessary for the Program to devise reasonable parameters that exclude some works from receiving CIP data.

Additionally, the limitations on inclusion in the CIP Program are related to the form a work takes, and does not discriminate between publications based on viewpoint. Indeed, Plaintiff does not allege any viewpoint discrimination in its Complaint. The CIP Program does not require an author or publisher to adopt a particular viewpoint in order to receive CIP data, does not limit the freedom of third parties to hear a particular viewpoint, and does not limit the expression of an author or publisher in any other way. Indeed, none of the conditions for participation in the Program have anything to do with conduct that can be considered expressive. Instead, the CIP Program operates under

permissible content-neutral restrictions in light of spending limitations and the goals of the Program. The program is not a burden to the First Amendment rights of those that do not qualify, and any benefits received from inclusion are merely incidental to the bibliographic purpose of the program. Thus, because the government has the discretion to set spending priorities and the CIP Program does not discriminate based on viewpoint or suppress particular ideas, Plaintiff's claim fails if analyzed under the unconstitutional conditions framework.

Because Plaintiff is unable to state a First Amendment claim under either the forum framework or the unconstitutional conditions framework that would entitle it to relief, the Library respectfully requests this Court to dismiss this case with prejudice.

6. <u>Plaintiff Has Not Shown a Violation of the Commerce Clause that Entitles it to Relief.</u>

Plaintiff's also alleges that the Library violated the Commerce Clause of the Constitution by denying it inclusion in the CIP program. (*See* Compl. ¶ 4.) Plaintiff has not, however, specifically stated by what authority it relies on in support of this claim.

The Commerce Clause provides Congress with the power "[t]o regulate Commerce with foreign Nations, and among the several states, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. Commerce Clause challenges arise in one of two contexts: the first is when Congress enacts legislation perceived as exceeding the constitutional authority granted by the Commerce Clause. *See e.g. United States. v. Morrison*, 529 U.S. 598 (2000) (challenging Congress' power under the Commerce Clause to regulate gender-motivated crimes of violence); *United States v. Lopez*, 514 U.S.

549 (1995) (invalidating Congress' attempt to regulate the possession of firearms within school zones). The second, known as a "dormant" Commerce Clause challenge, is an inquiry into state action that may discriminate against or unduly burden interstate commerce. *See Pike v. Bruce Church, Inc.,* 397 U.S. 137 (1970) (holding that a state regulation for packing fruit and vegetables was an unlawful burden on interstate commerce). Plaintiff's Complaint, however, does not assert a claim involving a congressional overstep of authority, nor does Plaintiff question a state action implicating interstate commerce. Thus, any potential claim conceivably based on the Commerce Clause must be dismissed.

It is well established that Congress has broad authority under the Commerce Clause. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S.Ct. 2566, 2585 (2012). This includes Congressional authority to regulate "the channels of interstate commerce," "persons or things in interstate commerce," and "those activities that substantially affect interstate commerce." *Id.* at 2578 (*quoting Morrison,* 529 U.S. at 609). This is not to say that Congress' regulatory authority under the Commerce Clause is without effective bounds. *Morrison,* 529 U.S. at 608. Congressional enactments can be invalidated, though "only upon a plain showing that Congress has exceeded its constitutional bounds." *Morrison,* 529 U.S. at 607. Plaintiff's Complaint, however, alleges no such unconstitutional violation of Congressional authority under the Commerce Clause.

Although the Commerce Clause functions as a limit on Congress' authority, it also acts as a restraint on state authority to regulate interstate commerce. "Implicit within the Commerce Clause is a negative or dormant feature that prevents individual states from

regulating interstate commerce." *IESI AR Corp. v. Nw. Ark. Reg'l Solid Waste Mgmt. Dist.,* 433 F.3d 600, 604 (8th Cir. 2006) (*quoting United Waste Sys. of Iowa, Inc. v. Wilson,* 189 F.3d 762, 765 (8th Cir. 1999)). The dormant Commerce Clause prevents states from enacting laws that "discriminate against or unduly burden interstate commerce." *IESI AR Corp.,* 433 F.3d at 604. Dormant Commerce Clause considerations arise when state actions are challenged, including state regulations, *see City of Philadelphia v. New Jersey,* 437 U.S. 617 (1978) (state statute prohibiting the importation of solid or liquid waste violated the Commerce Clause), and state taxation measures, *see Chem. Waste Mgmt., Inc. v. Hunt,* 504 U.S. 334 (1992) (state tax on hazardous waste generated outside of the state found unconstitutional). Dormant Commerce Clause analysis is also relevant for questions of concurrent federal and state regulation. *See Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 434 (1946) (Congress may exercise its broad authority under the Commerce Clause alone or in conjunction with coordinated action by the states). Plaintiff's Complaint does not address any state action that could present a dormant Commerce Clause violation.

As stated above, the Library's CIP Program is a no-cost cataloging initiative of the Library that prepares bibliographical data in advance of publication and was created under the Librarian's broad discretion to implement programs in support of the Library's mission. Furthermore, the CIP Program in no way limits an author or publisher's ability to promote or disseminate a work in commerce. Because Plaintiff's claim does not involve a question of exceeding congressional or state authority as limited by the Commerce Clause, it must be dismissed.

## C. Plaintiff's Complaint Requests Relief For Claims that are Not Ripe for Judicial Review.

Finally, Plaintiff has not alleged facts that would make its requested relief of inclusion of all its future publications in the CIP Program appropriate, as these future potential claims are not ripe for review. A claim is not ripe for adjudication if it is "contingent on future events that may not occur as anticipated, or indeed may not occur at all." *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 580-81 (1985). Ripeness "requires [courts] to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs.* v. *Gardner,* 387 U.S. 136, 149 (1967); *Tex. v. United States*, 523 U.S. 296, 300-01 (1998) (holding the case before it was not ripe for review because the issues were too remote and abstract, and because no day-to-day or immediate hardship would be imposed on the plaintiff).

In the instant case, Plaintiff is asking the Court to rule on future events, ostensibly, the hypothetical denial by the Library of CIP Data for future publications that do not yet exist. This denial of CIP Data, or the presumed creation of future publications, may never occur, making the issue not ripe for judicial consideration. In addition, no harm will come to the Plaintiff in having such a decision delayed, as Aspen Composers' Conference will be able to submit applications to the CIP Program in the future in the same manner as other publishers. Thus, the requested determination that all of Plaintiff's future publications be given CIP Data is not an issue ripe for adjudication and should not be addressed by this Court.

## V. **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that Plaintiff's Complaint be dismissed in its entirety and with prejudice.

Dated: February 14, 2013                    Respectfully submitted,

                                                        B. TODD JONES
                                                        UNITED STATES ATTORNEY

                                                        s/ Bahram Samie
                                                        BAHRAM SAMIE (#392645)
                                                        Assistant United States Attorney
                                                        300 South Fourth Street
                                                        Minneapolis, MN  55415
                                                        (612) 664-5600

                                                        ATTORNEYS FOR DEFENDANTS

OF COUNSEL:

Samantha Basso
Special Assistant General Counsel
Office of General Counsel
Library of Congress
Tel: (202) 707-8648
Fax: (202) 707-1594
Email: sbas@loc.gov